## LEAKE v. NEW YORK CENT. R. CO.
### No. 195.

Circuit Court of Appeals, Second Circuit. March 4, 1940.

James Gibson, of Albany, N. Y. (Clarence B. Des Jardins, of Washington, D. C., and R. Gray Williams and J. Sloan Kuykendall, both of Winchester, Va., of counsel), for plaintiff-appellee.

Whalen, McNamee, Creble & Nichols, of Albany, N. Y. (Melvin H. Coulston, of Washington, D. C., and Kenneth O. Mott-Smith, of New York City, of counsel), for defendant-appellant.

Before L. HAND, CHASE, and PATTERSON, Circuit Judges.

CHASE, Circuit Judge.

This is a suit in the usual form in which claims 1, 6, 12 and 14 of U. S. Patent No. 1,770,932 granted on July 22, 1930, on his application filed May 17, 1929, to Arthur G. Leake for a Method of Strengthening Structural Members Under Load were held valid and claims 6, 12, and 14 were held infringed by the defendant. An injunction was granted to restrain continued infringement and the cause was referred to a master for an accounting. The defendant appealed.

The plaintiff's ownership of the patent was established and infringement to the extent found below is not contested provided the claims are valid. The patent is for a method whereby girders of bridges or beams in structures or the like may be reinforced to increase their ability to carry not only additional live loads but also the dead weight they continuously support. It is a particularly desirable way to strengthen the girders in a bridge in a highway which crosses over railway tracks since it does away with any need for first eliminating the tendency in the girders to sag by shoring them up with its attendant obstruction of the railroad right of way; and also is suitable for use where the girders are so embedded in concrete that only their undersides are readily available for the addition of a strengthening member.

In carrying out the method he disclosed, the patentee made use of the principle that steel will expand when heated and contract as it cools. His specifications show that a suitable piece of steel can be loosely clamped along the underside of a girder under tension in that part; one end welded to the girder; heat applied until the added steel has expanded lengthwise as much as desired; and then the free end welded to the girder. When the added steel contracts as it cools to normal temperature, an end to end pull is exerted upon the girder which has a tendency to take out the sag and will, of course, increase the girder's resistance both to the dead weight load it carries and to any additional, or live load, it will be called upon to bear. After cooling, the strengthening piece is spot welded to the girder along its sides; the clamps are removed and the process is complete. When the part of the girder which is under compression instead of tension is to be given added resistance to the forces acting upon it, the specifications show how the reverse effect may be obtained with the same sort of clamping and welding by lowering the temperature of the added piece below normal and letting it expand as it resumes its normal temperature. But that feature is not involved in this suit.

There is ample reason to believe that a desirable method for adding strength to structural members of the kind mentioned was set forth in the specifications. Whether or not what was disclosed amounted to invention depends, of course, upon much more than that for unless what was new was such a departure from the old that inventive thought was required to bring it about there was no basis for granting the patent.

We do not find in the prior art as shown by this record a complete anticipation but what was proved does show that it was not new to strengthen girders which were under tension by adding to them steel strips which were attached cold. An article entitled "Use Electric Welding Process to Strengthen Bridge" was printed in the issue of "Railway Age" published June 18, 1927 which described how a bridge at Leavenworth, Kan., owned by the Leavenworth Terminal & Railway Company, had had its capacity increased by welding to chord members and floor beams what were called cover plates. The plates were first clamped to flanges of the pieces to be strengthened and then welded to them first at the ends and then between them. They were thus made to carry part of

168

the live load, though they did not share the dead load, and it is by giving his reinforcing pieces the ability to support part of the dead load when they contracted that Leake added a desirable feature to the method just mentioned.

 It appears, moreover, that the use of expansion by heating the added members and securing them at their ends so that their contraction would enable them to share the dead load strain on bridge stringers was not new either. A printed article that was published in "Engineering News Record" on March 11, 1920 entitled "Reconstructing Poughkeepsie Cantilever Bridge for Heavy Traffic" described the method there used, whereby added stringer pieces were installed in such a way that when heated after one end was attached and before the other was their contraction after both ends were fastened served to relieve the old stringers of some of the dead load as well as of part of any live load. The Poughkeepsie bridge had bottom chords which were eyebars whose ends encircled pins extending across the underside of the bridge at the ends of each bridge panel. To these bottom chords were added two new members made of angle bars connected by lattice work and attached to the pins at either end of a panel by the use of gusset plates in the following way: A gusset plate was fitted to one of the pins; then one end of the new member was riveted to that gusset plate; a gusset plate having rivet holes for use in riveting the free end of the new member to it was fitted to the pin at the opposite end of the bridge panel; that new member had similar rivet holes in its free end but was not long enough when cold to be riveted through them to the gusset plate; then the new member was heated until its expansion brought the rivet holes in its free end into juxtaposition with those in the gusset; then it was riveted, while so expanded, to the gusset and upon contraction when it cooled the pulling force so exerted upon the pins relieved the old chords pro tanto of the dead weight load. This method of securing dead weight relief differs from that of the patent in that riveting instead of welding was used and also in that new members were added instead of directly reinforcing the old chords themselves. It cannot now be thought that it requires invention to substitute welding of metal for riveting or vice versa whenever the one or the other appears to be most feasible. Both processes are well known to anyone of ordinary skill in the metal working art. That leaves as the feature which makes the patented method differ from that used on the Poughkeepsie bridge only the fact that Leake welded his reinforcing pieces directly to the old girders while the printed description of the Poughkeepsie bridge repairs shows the addition of new members to exert the same sort of effect upon the old girders.

Nor was it new when Leake applied for his patent to put stress upon metal frame work by welding heated members to the points in it at which it was desired to place tension and then allowing such members to cool. Patent No. 1,381,659 granted to Rapp and Vanorio June 14, 1921 clearly shows that.

 In view of this prior art of which the patentee is conclusively charged with knowledge, Bone v. Commissioners, 251 U.S. 134, 144, 40 S.Ct. 96, 64 L.Ed. 188, it can only be in his advance beyond that into the realm of useful novelty that invention can be found. Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856. Though it was shown that Leake was the first to weld heated steel reinforcement pieces directly to bridge girders and allow them to contract to exert end to end pull on the girders to give them added ability to resist both live and dead load strains, we cannot believe that that was a sufficient step beyond the prior art to amount to invention. See Hill v. Wooster, 132 U.S. 693, 10 S.Ct. 228, 33 L.Ed. 502.

 It is but fair to say that, after the publication of the description of the Leavenworth bridge repair by welding cold members to the old beams and after that of the description of the installation of new heated members in the Poughkeepsie bridge, the method of the patent did not go into use at once. It is very likely that despite these printed publications there was no general knowledge of what had been done. But since a patentee is to be conclusively charged with knowledge of all the relevant prior art and to have made his disclosure with all the aid such prior art might have given him, the patent must be tested from the background of that knowledge whether the patentee actually had it or not.

In the light of this test, it is not at all difficult to perceive that all Leake can be credited with having done is to heat re-

inforcing members as he knew they had been heated when the Poughkeepsie bridge was repaired and use the method for installing them which he knew had been used when the repairs to the Leavenworth bridge were made. The novelty of his disclosure consists only, therefore, in pointing out that in a repair job, otherwise made like that at the Leavenworth bridge, heated instead of cold reinforcements could be used whenever relief from dead load strain as well as live load was desired. We attach considerable importance to the fact that it was only a little less than two years after the Leavenworth repairs were made with cold metal before Leake filed his application. This wait was not of sufficient length to lead to the belief that there was any problem in making the change from cold to heated metal reinforcing pieces which one of the usual skill of the calling could not have readily solved had he had the knowledge of the prior art which the patentee is exclusively presumed to have had. The claims held valid below are, we think, all invalid for the reasons stated.

One additional ground of appeal remains. The complaint alleged that all claims of the patent were valid and infringed. A stipulation was filed on Sept. 29, 1938 to the effect that the plaintiff would rely only on claims 1, 6, 12, and 14. The parties by a stipulation filed Jan. 5, 1939, however, released each other from the provisions of the first stipulation. The plaintiff did not rely upon any other claims at the trial and the court declined to pass upon the validity of the others. With this the plaintiff was content but the defendant insisted, and insists now, that all the claims of the patent should have been adjudicated. This action of the trial court was within its sound discretion and will not be disturbed.

The action of the plaintiff in relying only upon the claims designated amounted to the assurance that they were typical of all those sued on. The decree will therefore be as broad in effect as was the issue joined and have the same force so far as this defendant is concerned as to claims which the plaintiff might have pressed as it will as to those which were actually relied on. Marshall v. Bryant Electric Co., 1 Cir., 185 F. 499; Great Northern Ry. Co. v. General Railway Signal Co., 8 Cir., 57 F.2d 457.

Decree reversed and bill dismissed.